COAST LAW GROUP LLP
HELEN I. ZELDES (220051)
helen@coastlaw.com
AMY C. JOHNSGARD (279795)
amy@coastlaw.com
ANDREW J. KUBIK (246902)
andy@coastlaw.com
BEN TRAVIS (305641)
ben@coastlaw.com
1140 S. Coast Highway 101
Encinitas, California 92024
Telephone: 760-942-8505
Facsimile: 760-942-8515

CUNEO GILBERT & LaDUCA LLP
CHARLES J. LaDUCA
charles@cuneolaw.com
4725 Wisconsin Ave., NW
Suite 200
Washington, D.C. 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
tblood@bholaw.com
THOMAS J. O'REARDON II (247952)
toreardon@bholaw.com
501 W. Broadway, Suite 1490
San Diego, CA 92101
Telephone: 619-339-1100
Facsimile: 619-338-1101

*Attorneys for Plaintiffs and the Proposed Class*
[additional counsel on signature page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| JORDAN O'HARA, BRENT COLLINS, OLIVIA JOHNSTON,  ANTHONY BELL, JULIANA WATSON, and ANN KOWALESKI, individually and on behalf of all others similarly situated, <br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., a Delaware corporation; CAMBRIDGE ANALYTICA, LLC, a Delaware limited liability company; ALEKSANDR KOGAN, an individual, STEPHEN K. BANNON, an individual, EMERDATA LIMITED, a United Kingdom company,  and DOES 1-10, Inclusive, <br> Defendants. | CASE NO.: 8:18:cv-00571-AG-JDE <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> Judge: Honorable Andrew J. Guilford <br><br> JURY TRIAL DEMANDED |

COAST LAW GROUP LLP

Plaintiffs JORDAN O'HARA, BRENT COLLINS, OLIVIA JOHNSTON, ANTHONY BELL, JULIANA WATSON, and ANN KOWALESKI (hereinafter "Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated against FACEBOOK, INC., a Delaware corporation; CAMBRIDGE ANALYTICA, LLC, a Delaware limited liability company; ALEKSANDR KOGAN, an individual; STEPHEN K. BANNON, an individual; EMERDATA LIMITED, a United Kingdom company; and Does 1 through 10.Plaintiffs hereby allege, on information and belief, except as to those allegations which pertain to the named Plaintiffs, which allegations are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.    Defendants Cambridge Analytica LLC, Aleksandr Kogan and Stephen K. Bannon conspired—with Defendant Facebook's help—to steal vast amounts of personal data of an estimated 87 million Facebook users (70 million of whom are in the United States) in an illegal effort to manipulate public opinion and elections throughout the United States, including the 2016 Presidential election. The breach has only recently made headlines, yet Facebook has been aware of this and other breaches similar in scope and purpose for years. In response to public outcry, Facebook has done next to nothing, including failing to notify the consumers whose personal information has been taken, in violation of California law.

2.    The tens of millions of Americans who use Facebook have entrusted Facebook to protect their personal data. For good reason, Facebook expressly assures users that, **"You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings."**[1] This is false and misleading.

---

[1] Facebook Terms of Service, January 30, 2015–present. https://www.facebook.com/terms.php

FIRST AMENDED CLASS ACTION COMPLAINT

3.     For years, Facebook has been aware of the faults in the system it created: "Sandy Parakilas, the platform operations manager at Facebook responsible for policing data breaches by third-party software developers between 2011 and 2012 . . . warned senior executives at the company that its lax approach to data protection risked a major breach, 'My concerns were that all of the data that left Facebook servers to developers could not be monitored by Facebook, so we had no idea what developers were doing with the data,' he said. Parakilas said Facebook had terms of service and settings that 'people didn't read or understand' *and the company did not use its enforcement mechanisms, including audits of external developers, to ensure data was not being misused*."[2] "It has been painful watching," he said, "because I know that they could have prevented it."

4.     Facebook's proposed remedial measures**, *announced only after the breach made headlines***, have been feeble and hollow. Facebook promises to "review our platform"; "tell people about data misuse"; and "encourage people to manage the apps they use." In fact, none of Facebook's stopgap measures adequately remedy or prevent the improper and illegal course of conduct alleged: in fact, users' data remains dangerously unprotected and open to further abuse. And none of Facebook's measures constitute adequate notice to affected consumers.

5.     Plaintiffs are Facebook users who believed that the valuable personal information they entered on the social media application was protected and would not be exploited for any illicit purposes. Reasonable consumers were unaware and could not be expected to know that Facebook's platform could be scraped to collect vast amounts of personal information that could then be aggregated and used in the way the Co-Conspirator Defendants used the data. Nonetheless, Facebook and the Co-Conspirator Defendants did just that: Facebook's failure to adequately protect

---

[2] https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-analytica-sandy-parakilas.

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

COAST LAW GROUP LLP

Plaintiffs' and the Class members' data allowed Co-Conspirator Defendants to engage in an illicit and illegal appropriation of the data, the purpose of which was, at least in part, to disrupt the 2016 American presidential race. The means by which this conspiracy was accomplished reads like an international crime novel, except that it actually happened. Contrary to Facebook's assurances that Plaintiffs' data would be protected, the Co-Conspirator Defendants, in the course of their unlawful conspiracy, accessed, harvested and sold the data of millions of individuals, including Plaintiffs, for, among other things, use in their efforts to undermine the democratic process during the 2016 U.S. presidential election. The personal information of Plaintiffs and the class members and, with it, the right to a free and fair election, was sold for approximately $7 million. Plaintiffs bring this action to remedy the data breach that has already occurred, to prevent this from happening in the future and to seek damages on behalf of the Class.

6.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated nationwide, asserting claims under the Stored Communications Act (18 U.S.C. §§ 2701, *et seq.*); Racketeer Influenced and Corrupt Organizations Act ("RICO" or 18 U.S.C. § 1962(c)), Intrusion Upon Seclusion; Negligence; Negligence Per Se; and Breach of Written Contract; California's Unfair Competition Law ("UCL" Cal. Bus. & Prof. Code §§ 17200, *et seq.*) and, on behalf of all those similarly situated, for violations of the California Invasion of Privacy Act (Cal. Pen. Code § 637.3); and violations of California's Consumer Records Act (Cal. Civ. Code §§ 1798.80, *et seq.*).

7.     Plaintiffs seek damages on behalf of the Class; injunctive relief; restitution; disgorgement; statutory penalties; costs and expenses, including attorneys' fees and expert fees; declaratory relief; and any additional relief that this Court determines to be necessary to provide complete relief to Plaintiffs and the Class.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) ("CAFA"), as to the named

3

Plaintiffs and every member of the Class, because the proposed Class contains more than 100 members, the aggregate amount in controversy exceeds $5 million, and members of the Class reside across the United States and are therefore diverse from Defendants.

9.     This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1331. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court has jurisdiction over Defendants because they conduct business in California, both in connection with the facts giving rise to this lawsuit and generally, and have sufficient minimum contacts in California, or otherwise intentionally avail themselves of the markets within California, through the promotion, sale, marketing and distribution of their services and products in California, to render the exercise of jurisdiction by this Court proper and necessary.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

12.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(d) because Defendant Facebook, Inc. resides in this district by virtue of its contacts within this District.

## THE PARTIES

**Class Representatives**

13.     Plaintiff Jordan O'Hara is a resident of the city of San Diego, California, a registered voter, and has maintained a Facebook profile at all relevant times herein.

14.     Plaintiff Brent Collins is a resident of the city of Newport Beach, California, a registered voter, and maintained a Facebook profile at all relevant times herein.

15.     Plaintiff Olivia Johnston is a resident of Culver City, California, a registered voter, and has maintained a Facebook profile at all relevant times herein.

COAST LAW GROUP LLP

4

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

16.    Plaintiff Anthony Bell is a resident of the city of Lakewood, California, a registered voter, and has maintained a Facebook profile at all relevant times herein.

17.    Plaintiff Juliana Watson is a resident of Culver City, California, a registered voter, and has maintained a Facebook profile at all relevant times herein.

18.    Plaintiff Ann Kowaleski is a resident of Los Angeles, California, a registered voter, and has maintained a Facebook profile at all relevant times herein.

19.    Plaintiffs O'Hara, Collins, Johnston, Bell, Watson, and Kowaleski are referred to herein as "Plaintiffs."

**Defendants**

20.    Defendant FACEBOOK, INC. ("Facebook") is a Delaware corporation with its principal place of business in Menlo Park, California. Facebook operates a social networking website which allows its users to interact and communicate with other individuals.

21.    Defendant CAMBRIDGE ANALYTICA LLC ("Cambridge") is a Delaware limited liability company involved in data mining and data analysis. The parent company of Cambridge is U.K. company SCL GROUP ("SCL Group") (formerly Strategic Communication Laboratories). It maintains offices in New York and Washington D.C.

22.    Defendant DR. ALEKSANDR KOGAN a/k/a ALEKSANDR SPECTRE ("Kogan") is a resident of the state of California. Kogan was a founder of Global Science Research, Ltd. ("GSR"). At all relevant times, Kogan had decision-making authority at GSR and directed, approved, or otherwise ratified the actions taken by GSR as alleged herein.

23.    Defendant STEPHEN K. BANNON ("Bannon") is a resident of the District of Columbia. At all relevant times, Bannon was a part owner, Vice President, and Secretary of Defendant Cambridge until he resigned from those positions to act as the chief executive of Donald Trump's presidential campaign. At all relevant times,

Bannon had decision-making authority at Cambridge and directed and approved the actions taken by Cambridge as alleged herein.

24.    Defendant EMERDATA LIMITED ("Emerdata") is a United Kingdom company with its principal address in London, England and is along with SCL Elections Ltd. the parent corporation of Defendant CAMBRIDGE ANALYTICA LLC.

25.    Defendants Cambridge, Kogan, Bannon, and Emerdata are referred to from time to time collectively hereafter as the "Co-Conspirator Defendants," and individually from time to time as a "Co-Conspirator."

**Unnamed Co-Conspirators**

26.    Various corporations and individuals not named as defendants in this Complaint participated as co-conspirators in the conduct alleged herein and performed acts and made statements in furtherance thereof.

27.    On information and belief, other actors participated with Defendants in the conspiracy described in this Complaint. All allegations against Defendants are also alleged against the unnamed co-conspirators as if they were set forth in this Complaint. Each of these DOE defendants is responsible in some manner for the conduct alleged herein. Plaintiffs will amend this Complaint to show their true names and capacities when they have been ascertained.

## FACTUAL BACKGROUND

**Facebook's Vast Treasure Trove of Data**

28.    Since its inception in 2004, Facebook has become synonymous with interconnectedness in the age of social media. Facebook now has over two billion monthly active users, with over 200 million in the United States alone. Facebook has become one of the world's leading repositories of personal data.

29.    A virtual tsunami of private information of each of Facebook's billions of users is regularly recorded into their unique Facebook profiles and stored by Facebook, including: all manner of biographical information (e.g., current and former

COAST LAW GROUP LLP

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

names; alternate names; hometown; birthdate; gender; family connections; education; email address; relationship status; education and work history; interests; hobbies; religious and political affiliations; phone number; spoken languages); current and former addresses; dates and times of active sessions on Facebook; dates and times and titles of any advertisements that were "clicked" by the Facebook user; connections with other Facebook users; communications with other Facebook users through the integrated Facebook "Messenger" application and the user Facebook inbox; current and last location; attendance at events and social gatherings; stored credit card information used to make purchases on Facebook; people the Facebook user is "friends" with or follows; Facebook groups the user is a member of; a list of IP addresses where the user has logged into and out of his or her account; posts or sites the user has "liked"; searches conducted by the user on Facebook; photographs and videos documenting all aspects of their lives and the lives of their friends and family; and their activity in Facebook-connected applications ("User Information").

30.    It is unclear exactly how much User Information is out there – Facebook announced [on April 4, 2018] that it collects user data across Instagram, Messenger and Whatsapp—three other massive social media/mobile apps it owns.[3] Facebook also admitted that "Malicious actors have also abused these features [Facebook's "friend" search function] to scrape public profile information by submitting phone numbers or email addresses they already have through search and account recovery. Given the scale and sophistication of the activity we've seen, we believe most people on Facebook could have had their public profile scraped in this way . . . . 'Most people on Facebook' means that we're talking about *at least* a billion users whose public Facebook information has been spirited away into databases unknown."[4]

---

[3] https://www.cnbc.com/2018/04/04/facebook-updates-its-terms-of-service-to-include-messenger-instagram.html.

[4] https://www.theatlantic.com/technology/archive/2018/04/most-people-on-facebook-may-have-had-their-accounts-scraped/557285/.

FIRST AMENDED CLASS ACTION COMPLAINT

31.    In February 2016, Mark Zuckerberg, the Chief Executive Officer of Facebook, reported the average Facebook user spends 50 minutes a day collectively on the company's Facebook, Instagram, and Messenger platforms.[5]

32.    A vital feature of the viral spread of Facebook is the appearance of control users have over their sensitive User Information. Facebook's privacy settings purport to offer users control over the dissemination of various categories of their User Information, whether it be privately with particular individuals, with all of their Facebook friends, with friends of friends, or with all Facebook users. Users thus reasonably expect User Information will only be accessible to the extent they authorize such access.

33.    In reality, the personal information of at least 87 million Facebook users were not within the control of the respective individual consumers, but instead had been improperly and illicitly harvested by Defendant Cambridge to, among other things, improperly influence and otherwise disrupt the outcome of the 2016 Presidential election.

34.    What made the breach giving rise to this action so alarmingly effective is the vast collection of personal data Facebook has, including purportedly private communications across this country and the globe.

35.    Facebook and the Co-Conspirator Defendants unlawfully appropriated this vast store of data, and then the Co-Conspirator Defendants used it to further their own improper purposes, i.e., to improperly and surreptitiously influence the 2016 presidential election. Beyond those efforts to undermine a fundamental right of citizens to vote in a valid, transparent election or to otherwise destabilize democratic institutions, the nefarious uses of this data could have other far-reaching implications, as identity theft, ransomware, and other on-line threats continue to multiply on a daily

---

[5] https://techcrunch.com/2016/04/27/facediction/

FIRST AMENDED CLASS ACTION COMPLAINT

basis. This action seeks to hold these Defendants to account for their improper and unlawful actions.

**Facebook's Predators: The Birth of Cambridge Analytica**

36.   Cambridge is "Steve Bannon's psychological warfare tool"—his brainchild with "secretive US hedge-fund billionaire and Republican donor" Robert Mercer.[5] Together, in 2013, the "then executive chairman of the 'alt-right' news network Breitbart" (Bannon) and Cambridge Analytica's primary investor (Mercer) joined forces to "bring big data and social media to an established military methodology—'information operations'—then turn it on the US electorate." [6]

37.   Cambridge's parent company, SCL Group, is a military contractor known as "a British psy-ops [psychological operations] company."[7] Defendant Bannon in conjunction with SCL created a new company called Cambridge Analytica.[8] Investor Robert Mercer funded the company with $15 million,[9] and Bannon was installed as Vice President and Secretary. British citizen Alexander Nix was installed as Chief of Executive Officer.[10] Cambridge was created with the primary goal of shaping U.S. elections.[11]

[5]  https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump

[6] *Ibid*. https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

[7] https://www.theguardian.com/uk-news/2018/mar/23/former-cambridge-analytica-executive-brittany-kaiser-wants-to-stop-lies.

[8] https://www.cnn.com/2018/03/30/politics/bannon-cambridge-analytica/index.html

[9] https://www.motherjones.com/politics/2018/03/cloak-and-data-cambridge-analytica-robert-mercer/

[10]https://en.wikipedia.org/wiki/Cambridge_Analytica.

[11] https://www.washingtonpost.com/2018/03/22/330b188e-2c7d-11e8-8688-e053ba58f1e4_story.html?utm_term=.aa71902b296d.

9

COAST LAW GROUP LLP

COAST LAW GROUP LLP

38.     **Defendant Bannon Oversaw Cambridge Analytica's Harvesting of User Information**. "Conservative strategist Stephen K. Bannon oversaw Cambridge Analytica's early efforts to collect troves of Facebook data as part of an ambitious program to build detailed profiles of millions of American voters, a former employee of the data-science firm [Christopher Wylie] said [on March 20, 2018]. . . . The 2014 effort was part of a high-tech form of voter persuasion touted by the company, which under Bannon identified and tested the power of anti-establishment messages that later would emerge as central themes in President Trump's campaign speeches. . ."[12]

39.     **To Perpetrate the Illegal Scheme, Bannon and Cambridge Hire Defendant Kogan**. In furtherance of its mission, in June 2014, Cambridge set out to acquire behavioral data of American citizens. Cambridge reached an agreement with Kogan, a researcher at Cambridge University, to harvest Facebook data "so that it could be matched to personality traits and voter rolls."[13]

40.     **Kogan's Artifice: Global Science Research Ltd. is Born**. To perpetuate this illegal harvesting of data, Kogan needed to create a scheme to dupe users into providing their User Information. Kogan created a U.K. company called Global Science Research, Ltd. ("GSR") for this purpose. Kogan, through GSR, created a Facebook app called "ThisIsYourDigitalLife" ("YDL") which consisted of a personality quiz. Kogan utilized Amazon Mechanical Turk's ("MTurk") program to recruit participants (known as "Turkers") to complete the personality quiz. Kogan offered the Turkers $0.50-$2.00 to complete the quiz.

41.     The fees paid to quiz participants were made via transfer or other electronic means via the Internet.

---

[12] https://www.washingtonpost.com/politics/bannon-oversaw-cambridge-analyticas-collection-of-facebook-data-according-to-former-employee/2018/03/20/8fb369a6-2c55-11e8-b0b0-f706877db618_story.html?utm_term=.4d797fd61acf
[13] https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

42.     When Turkers responded to Kogan's request and expressed interest in completing the personality quiz, Kogan sent them a link to his Facebook application. Participants then completed the personality quiz, but in order to receive payment they were told that they needed to allow the quiz app access to their Facebook data for academic purposes. "And not just theirs, but their friends' too. On average, each 'seeder'—the people who had taken the personality test, around 300,000 in total—unwittingly gave access to at least 160 other people's profiles, none of whom would have known or had reason to suspect. What the email correspondence between Cambridge Analytica employees and Kogan shows is that Kogan had collected millions of profiles in a matter of weeks."[14] But no one "at Cambridge Analytica had checked that it was legal."[15]

43.     At no time did GSR inform the Turkers that they were sharing their User Information with others or request authorization to share their User Information.

44.     **Cambridge's Big Data Sweep**. Kogan's "quiz" was highly successful: 270,000 people completed the quiz, providing GSR access to their User Information,[16] unwittingly also providing information of their friends, for a sweep of over 87 million Facebook users' profile information ("the YDL Breach").

45.     Kogan provided the improperly obtained data to Cambridge under the terms of their contract. In turn, Cambridge used the data to create "psychographic" profiles that could be used to design targeted political ads.

46.     Christopher Wylie, a former employee of Cambridge and now whistleblower, explained, "We exploited Facebook to harvest millions of people's

---

[14] https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.
[15] *Id.*
[16] https://www.cbsnews.com/news/cambridge-analytica-facebook-was-used-to-scrape-millions-of-peoples-personal-data/.

FIRST AMENDED CLASS ACTION COMPLAINT

profiles. And built models to exploit what we knew about them and target their inner demons. That was the basis the entire company was built on."[17]

47.     Brittany Kaiser, a former executive at Cambridge and another whistleblower, explained, "The kind of personality questionnaires conducted by the Cambridge psychologist Aleksandr Kogan on Facebook were particularly important…as they allowed the company's data scientists to build models connecting data to behavioral traits and build 'a very in-depth picture on those individuals.'"[18]

48.     "Around mid-2015, Kaiser says, the company knew Facebook was changing its API rules to restrict the data that could be harvested through questionnaires like Kogan's. This appears to have prompted a last-minute grab for data. In one internal email seen by the Guardian, employees are asked to identify which issues on a list of 500 Facebook 'like' items would be most 'useful for political modeling or commercial sales.'"[19]

49.     A contract between SCL Elections Limited and GSR, signed by Defendant Kogan and Cambridge CEO Alexander Nix, reveals an intent to circumvent Facebook restrictions to obtain the User Information. It notes that the benefit to GSR's method is that it uses an application under Facebook's old terms of service as new applications could not access friend networks. The contract also notes that data will be gathered on the Turkers' Facebook friends as well.[20]

[17] https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election.
[18] https://www.theguardian.com/uk-news/2018/mar/23/former-cambridge-analytica-executive-brittany-kaiser-wants-to-stop-lies.
[19] https://www.theguardian.com/uk-news/2018/mar/23/former-cambridge-analytica-executive-brittany-kaiser-wants-to-stop-lies.
[20] https://www.parliament.uk/documents/commons-committees/culture-media-and-sport/Chris%20Wylie%20Background%20papers.pdf

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

50.     The contract further notes that the data was collected in order to target voters in eleven states: Arkansas, Colorado, Florida, Iowa, Louisiana, Nevada, New Hampshire, North Carolina, Oregon, South Carolina and West Virginia.[21]

51.     GSR was to make reasonable efforts under the contract to provide two million records for those eleven states.[22]

52.     The payments to GSR as well as the payments to the survey respondents, were made through wire transfer or other electronic payment method.

53.     Bannon was directly involved in the contract with GSR, had full knowledge of how GSR was going to acquire the information, ratified it, and was in support of it.[23]

54.     **Cambridge's Scheme was Successful**: targeted political ads were published across the United States (without any disclaimers in violation of Federal Election laws).[24]

55.     **Cambridge's CEO is Recorded Promoting the Scheme**. On March 20, 2018, Cambridge announced that it was suspending Nix as its CEO "after British television released secret recordings that appeared to show him talking about entrapping political opponents."[25] In the recording, Nix describes the many illicit

---

[21] *Id.*

[22] *Id.*

[23] https://www.cnn.com/2018/03/20/politics/steve-bannon-cambridge-analytica/index.html.

[24] "Any public communication made by a political committee—including communications that do not expressly advocate the election or defeat of a clearly identified federal candidate or solicit a contribution—must display a disclaimer." "A 'disclaimer' notice is a statement that identifies the person(s) who paid for the communication and whether the communication was authorized by one or more candidates. 52 U.S.C. § 30120.

[25] https://www.theguardian.com/uk-news/2018/mar/20/cambridge-analytica-suspends-ceo-alexander-nix

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

techniques utilized by Cambridge to influence campaigns[26]. He brags to a potential client about Cambridge's extensive experience in entrapping political candidates by deploying spies to offer bribes:





[26] https://www.washingtonpost.com/politics/bannon-oversaw-cambridge-analyticas-collection-of-facebook-data-according-to-former-employee/2018/03/20/8fb369a6-2c55-11e8-b0b0-f706877db618_story.html?utm_term=.468d326c84e6.

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP



56.     Nix and his partner, Mark Turnbull, detail their practice of operating through different entities, with different names, "so that no record exists with our name attached to this at all" and propaganda can be disseminated with no verification of its source:



FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

# SUCCESSOR LIABILITY ALLEGATIONS

57. Emerdata is Cambridge 2.0.  On August 11, 2017, executives at Cambridge formed Defendant Emerdata in the U.K.[27]

58. Emerdata was formed to acquire all of Cambridge and SCL, according to one of SCL's directors, Nigel Oakes.[28]

59. Emerdata's board of directors includes Rebekah and Jennifer Mercer (Robert Mercer's daughters), and Nix (its CEO).

60. Julian David Wheatland, Chairman of the Board of SCL, is also a director of Emerdata.[29]  Alexander Tayler, Chief Data Scientist at SCL, was a founder of Emerdata.[30]

61. The Mercers' appointments to the Emerdata board followed just days after revelations about Cambridge's role in manipulating voters during the 2016 presidential election through the YDL Breach.

62. The following chart illustrates the interconnectedness of Cambridge and Emerdata:[31]

---

[27] https://beta.companieshouse.gov.uk/company/10911848

[28] https://medium.com/@wsiegelman/chart-emerdata-limited-the-new-cambridge-analytica-scl-group-63283f47670d

[29] https://www.bloomberg.com/research/stocks/private/person.asp?personId=1680334&privcapId=1661331&previousCapId=1661331&previousTitle=Capstone%20Innovation%20Limited

[30] https://www.bloomberg.com/research/stocks/private/person.asp?personId=320043977&privcapId=72454231&previousCapId=72454231&previousTitle=SCL%2520Group%2520Limited

[31] https://medium.com/@wsiegelman/chart-emerdata-limited-the-new-cambridge-analytica-scl-group-63283f47670d

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP



63.     Plaintiffs are informed and believe and thereon allege that Defendant Emerdata is the successor in interest of Defendant Cambridge.

64.     Plaintiffs are informed and believe and thereon allege that Defendant Cambridge transferred assets, including valuable User Information obtained illegally as alleged herein and without adequate consideration.  Plaintiffs further allege the transfers of assets by Cambridge to Emerdata was done fraudulently with the intent of escaping liability to creditors, including Plaintiffs.

65.     Plaintiffs are further informed and believe and thereon allege that Defendants Cambridge and Emerdata are mere instrumentalities or conduits of each other in the prosecution of a single venture.  Plaintiffs are further informed and believe and thereon allege that there was such unity of interest and ownership between these entities that any separateness between them ceased to exist.  Further, under the facts and circumstances alleged below, adherence to any separateness between these entities would promote injustice and make it inequitable for either of these entities to escape liability for the conduct of the others.  In addition, Plaintiffs allege that these entities

FIRST AMENDED CLASS ACTION COMPLAINT

freely transferred rights, assets and obligations between themselves without consideration or formality in a manner reflecting there was no separateness between them.

66.    Plaintiffs are further informed and believe and thereon allege that Defendant Cambridge transferred relevant rights and obligations without adequate consideration to successor Emerdata, which are their mere continuations, when it became tactically beneficial or convenient for the entities.

67.    **Kogan Continues Data Collection**. In 2015, Defendant Kogan formed a new company – this time in the United States - with a presence in San Francisco called Philometrics, which he touts as providing "*Survey Software with AI [artificial intelligence] Superpowers*."[32] Philometrics' website ominously advertises that it is integrated with MTurk [Mechanical Turk], the very same application used by Kogan to illicitly obtain User Information in the YDL Breach. *Id.*

68.    **Facebook's Security Practices are Negligent, if not Reckless.** Facebook's negligent data security practices and systematic failure to enforce its own ineffective data security policies were exploited for financial and political gain by the Co-Conspirator Defendants.

69.    As early as 2011, Facebook's executives were apprised of its data vulnerabilities. Sandy Parakilas, a former operations manager responsible for data policy violations, provided a detailed presentation outlining the data vulnerabilities and exposure to users to senior Facebook executives. His warnings were met with "little to no response."[33]

COAST LAW GROUP LLP

---

[32] https://philometrics.com/.

[33] https://www.washingtonpost.com/opinions/i-worked-at-facebook-i-know-how-cambridge-analytica-could-have-happened/2018/03/20/edc7ef8a-2bc4-11e8-8ad6-fbc50284fce8_story.html?utm_term=.faaca3c6d7b4.

18

FIRST AMENDED CLASS ACTION COMPLAINT

70.     Also in 2011, Max Schrems, currently an Austrian lawyer, filed several complaints against Facebook in Ireland. One of those complaints flagged the security vulnerability of apps obtaining information of "friends" of the user.[34]

71.     After those early unheeded warnings, in the spring of 2012 Facebook held its initial public offering ("IPO"). It was the third-largest IPO in U.S. history. At $38 per share, the social networking giant was valued at $104.2 billion.[35]

72.     Privacy is very important to Facebook users. Facebook's CEO, Mark Zuckerberg has publicly acknowledged that people share on Facebook because "they know their privacy is going to be protected."[36] The security of privacy allows Facebook users to freely "engage and share their content and feel free to connect because they know that their privacy is going to be protected."[37]

73.     Facebook sets forth its data security policies in a Statement of Rights and Responsibilities and in a separate Data Policy.

74.     The opening line of Facebook's Statement of Rights and Responsibilities is unambiguous:

**1.     Privacy**

Your privacy is very important to us. We designed our Data Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information. We encourage you to read the Data Policy, and to use it to help you make informed decisions.

---

[34] https://techcrunch.com/2018/03/24/facebook-was-warned-about-app-permissions-in-2011/

[35] https://www.forbes.com/sites/tomiogeron/2012/05/17/facebook-prices-ipo-at-38-per-share/#70689bbc728a.

[36] *Id.*

[37] https://www.cnbc.com/2018/04/03/zuckerberg-on-facebook-and-privacy-before-cambridge-analytica-scandal.html

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

COAST LAW GROUP LLP

### 2. Sharing Your Content and Information

You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings. [38]

75. Facebook thus explicitly misleads its users into believing it is their right to control their User Information.

76. Facebook's policies further prohibit "any action…that infringes or violates someone else's rights or otherwise violates the law."[39] However, as Mr. Parakilas later revealed, Facebook lacked the means and the motive to enforce this seemingly strict policy.

77. In Mr. Parakilas's opinion, Facebook systematically failed to enforce its own policies in order to avoid drawing attention to its vulnerabilities.[40] Luring its consumers into a false sense of security and privacy is a key feature to Facebook's proliferation and, by extension, its value.

78. In December 2015, *The Guardian* published an article which exposed the unauthorized harvesting of tens of millions of Facebook users by Defendants Cambridge and Kogan on behalf of Senator Ted Cruz's presidential campaign.[41] Facebook's attorneys reportedly informed Cambridge that:

> "[M]isleading people or misusing their information is a direct violation of our policies and we will take swift action against companies that do,

---

[38] https://www.facebook.com/terms.php (emphasis added).

[39] *Ibid*.

[40] https://www.washingtonpost.com/opinions/i-worked-at-facebook-i-know-how-cambridge-analytica-could-have-happened/2018/03/20/edc7ef8a-2bc4-11e8-8ad6-fbc50284fce8_story.html?utm_term=.32eca9809e8d.

[41] https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data.

FIRST AMENDED CLASS ACTION COMPLAINT

including banning those companies from Facebook and requiring them to destroy all improperly collected data."[42]

79.   But Facebook did neither.[43] They took no further action.

80.   Facebook admits it had knowledge that User Information had been extracted by Kogan and Cambridge in 2015.[44] But when it finally took any steps in mid-2016, it merely wrote to Cambridge stating that the data could not be used and asked Cambridge to delete the data.[45]

81.   Christopher Wylie, who responded to Facebook's request to delete the illicitly obtained data, was astonished by Facebook's lackluster response. Facebook did nothing to confirm whether the data had been deleted. "All they asked me to do was tick a box on a form and post it back." To date, all data still has not been deleted.[46]

82.   In June 2016, a Facebook Vice President Andrew Bosworth circulated a memorandum entitled "The Ugly." The memo highlights many of Facebook's questionable practices putting infinite growth above all else, even the security, privacy and safety of its users.[47] An excerpt from the memo has proven both illustrative and chillingly prophetic:

COAST LAW GROUP LLP

---

[42] http://billmoyers.com/story/kushner-timeline/.
[43] https://newsroom.fb.com/news/2018/03/suspending-cambridge-analytica/.
[44] See Mark Zuckerberg statement on Facebook, March 21, 2018. https://www.facebook.com/zuck/posts/10104712037900071
[45] https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.
[46] https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election.
[47] https://www.buzzfeed.com/ryanmac/growth-at-any-cost-top-facebook-executive-defended-data?utm_term=.gt3GMx2wQ5#.olr8JBAkEN.

FIRST AMENDED CLASS ACTION COMPLAINT

So we connect more people

That can be bad if they make it negative. Maybe it costs a life by exposing someone to bullies. Maybe someone dies in a terrorist attack coordinated on our tools.

And still we connect people.

The ugly truth is that we believe in connecting people so deeply that **anything that allows us to connect more people more often is \*de facto\* good.** It is perhaps the only area where the metrics do tell the true story as far as we are concerned.

ANDREW BOSWORTH, FACEBOOK
JUNE 18, 2016

83.     In the weeks leading up to the November 2016 election, Mark Zuckerberg's trusted mentor and longtime investor, Roger McNamee, sounded the alarm about platform manipulation. Facebook executives brushed his concerns aside.[48]

84.     It was not until whistleblowers came forward mere weeks ago that Facebook finally suspended Cambridge and Kogan from using Facebook, reportedly because "[p]rotecting people's information is at the heart of everything we do, and we require the same from people who operate apps on Facebook."[49] Yet Facebook continues to deny the YDL Breach was a data breach since "everyone involved gave their consent" and "no systems were infiltrated."[50]

85.     Kogan has admitted that not only did his app obtain profile data of Facebook users but it also obtained users' direct messages.[51]

---

[48] https://work.qz.com/1233606/maybe-facebook-ceo-mark-zuckerberg-shouldnt-have-blown-off-his-mentor-roger-mcnamee/.
[49] http://money.cnn.com/2018/03/19/technology/business/facebook-data-privacy-crisis/index.html
[50] https://newsroom.fb.com/news/2018/03/suspending-cambridge-analytica/.
[51] https://www.theguardian.com/uk-news/2018/apr/13/revealed-aleksandr-kogan-collected-facebook-users-direct-messages

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

COAST LAW GROUP LLP

86.     Further belying that Facebook is protecting user privacy, Facebook recently banned another app called Cubeyou from Facebook for doing the same things that Cambridge did, illegally harvesting information by using a personality quiz.[52]

87.     Facebook cannot have it both ways. It cannot mislead users into believing they have control over the privacy of their User Information while simultaneously granting unfettered access to that information to third parties under the guise of "consent."

To date, Facebook has failed to provide adequate notice to the over 87 million users whose User Information was compromised by the YDL Breach. In fact, it denies there ever was a data breach.[53]

88.     Affected Facebook users have been injured because: (i) they no longer have control over their User Information and how it is used, as promised by Facebook, (ii) the value of their User Information, which there is a well-established market for, has diminished because it is no longer private, (iii) their User Information has been misused and is vulnerable to continued misuse; (iv) they will have to spend time and money securing their User Information, protecting their identities and mitigating misuse of their User Information; and (v) they were denied an opportunity to equally participate in the political process by virtue of being improperly targeted with illegal campaign advertisements. They will need to monitor their accounts and credit and will have to pay for further identity theft protection services in the wake of the data breach, to make sure their identities were not stolen.

89.     **Facebook Has Provided Inadequate Notice of the Breach.** Injunctive relief is particularly urgent here, where Facebook has not only failed to provide any

---

[52] https://www.theguardian.com/technology/2018/apr/09/facebook-suspends-cubeyou-over-harvesting-data-claims
[53] https://economictimes.indiatimes.com/tech/internet/data-breach-claims-false-facebook/articleshow/63353256.cms.

23

COAST LAW GROUP LLP

1  meaningful notice of the YDL Breach to its users, but instead has steadfastly denied

2  there ever was a breach.[54]

3    90.    Only in the aftermath of news of the YDL Breach, Facebook has

4  attempted to salvage its brand and rebuild consumer trust by revamping its privacy

5  policies.  In a March 26, 2018 letter from Facebook's Head of Public Policy, Rebecca

6  Stimson promises Facebook will, e.g. "review our platform"; "tell people about data

7  misuse"; and "encourage people to manage the apps they use."[55]  The following day,

8  CEO Zuckerberg publicly refused to appear before the British Parliament to answer

9  questions regarding the YDL Breach.[56] On the afternoon of April 4, 2018, after

10 rebuffing Parliament, Facebook published a new data policy on its website.[57] The new

11 data policy is wholly inadequate and sufficiently vague to allow ongoing breaches.  For

12 example, included under the heading, "What kinds of information do we collect" are

13 the following categories of information: "things you do and information you provide;

14 things others do and information they provide; information about payments;

15 information from third-party partners; and Facebook companies."  The heading, "How

16 is this information shared" includes "apps, websites and third-party integrations on or

17 using our Services; sharing within Facebook companies; and vendors, service

18 providers and other partners."[58]

19

20

21

22

23

24  [54] https://economictimes.indiatimes.com/tech/internet/data-breach-claims-false-
facebook/articleshow/63353256.cms.

25  [55] https://regmedia.co.uk/2018/03/27/letter_damian_collins_
from_facebook_26_macrh_2018.pdf.

26  [56] https://nypost.com/2018/03/27/mark-zuckerberg-refuses-to-testify-before-british-

27  parliament/.

28  [57] https://www.facebook.com/about/privacy.
[58] https://newsroom.fb.com/news/2018/04/terms-and-data-policy.

FIRST AMENDED CLASS ACTION COMPLAINT

91.     On April 10, 2018, Zuckerberg appeared before the Senate Judiciary Committee and the Senate Committee on Commerce, Science and Transportation. Zuckerberg admitted that Facebook made a mistake and committed to getting it right.[59]

92.     Facebook's stopgap measures fail to provide an adequate remedy or prevent further improper and illegal conduct.  For one thing, User Information already compromised remains dangerously vulnerable and open to further abuse. And none of Facebook's measures constitute adequate notice to affected consumers. Further, Facebook is not legally bound by any of the public relations promises it has made. Indeed, historically Facebook has a long history of failing to enforce its own data security policies.

93.     On April 26, 2018, in a filing with the Securities and Exchange Commission, Facebook said it expects to discover and announce more "instances of misuse of user data or other undesirable activity by third parties."[60]

94.     These instances show that Facebook cannot be trusted to ensure User Information is protected.

## **PLAINTIFFS' ADDITIONAL ALLEGATIONS**

**Plaintiff Jordan O'Hara**

95.     Mr. O'Hara is a veteran who served in the United States Navy. He has maintained profiles on Facebook and Instagram for several years. He has regularly conducted online searches related to various aspects of the military.

96.     During the Presidential campaign and 2016 election season, Mr. O'Hara noticed that his Instagram search feed in particular contained a high percentage of right-wing propaganda. This propaganda included, for example, memes mocking Hillary Clinton. This seemed odd to Mr. O'Hara because he is a registered Democrat.

[59] https://www.thestreet.com/technology/watch-facebook-zuckerberg-testify-in-front-of-congress-live-14550392
[60] https://www.bloomberg.com/news/articles/2018-04-26/facebook-says-there-may-be-more-cambridge-analytica-sized-leaks

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

He would not have intentionally sought out any anti-Clinton propaganda or humor. His sense at the time was that he was in some way being targeted to receive this propaganda because there was an assumption that he was active in the military and thus a Republican.

97.     In recent days and weeks, Mr. O'Hara has suspected his personal information likely has been knowingly mined by the Defendants for the purpose of improper campaigning.

98.     Plaintiff O'Hara provided his valuable personal data as consideration for use of Facebook. Plaintiff O'Hara relied on Facebook's promises to secure his data as stated in the Privacy Policy.

**Plaintiff Brent Collins**

99.     Mr. Collins has been an avid user of social media, in particular Facebook and Instagram, for many years. During the relevant time period, he had approximately 700 Facebook "friends." Facebook was his primary means of communicating with his family members, former classmates, and coworkers, among other people.

100.    Like so many others, during the 2016 Presidential election season,    Mr. Collins was dismayed by the amount of divisiveness he observed on social media. He saw what he thought was an unusually large amount of highly negative and politically divisive posts.

101.    In addition to being inundated with false and misleading information, during the 2016 Presidential election season, Mr. Collins recalled being frequently targeted with political ads while using Facebook.

102.    After the news broke about Defendant Cambridge harvesting Facebook's user's personal data, Mr. Collins felt he could no longer in good conscience use this platform. He posted a March 20, 2018 *New York Times* article entitled "Facebook Faces Growing Pressure Over Data and Privacy Inquiries" dated accompanied by this comment:

COAST LAW GROUP LLP

Tuesday, March 20, 2018 at 10:25pm PDT

> I have decided that I will delete my Facebook account. It is unfathomable that the company can have so much power to be misused and take so little responsibility. The consequences could not have been more serious and with 2018 elections around the corner, there is no time for their excuses, which is pretty much all I have seen from Zuckerburg. I encourage others to take the same action. New Investigations Into Facebook Add New Pressures - The New York Times

103.   Shortly thereafter, he deleted his Facebook account.

104.   Plaintiff Collins provided his valuable personal data as consideration for use of Facebook. Plaintiff Collins relied on Facebook's promises to secure his data as stated in the Privacy Policy.

**Plaintiff Olivia Johnston**

105.   Ms. Johnston is a young professional and resident of Los Angeles. She has maintained profiles on Facebook and Instagram for several years.

106.   Plaintiff Johnston provided her valuable personal data as consideration for use of Facebook. Plaintiff Johnston relied on Facebook's promises to secure her data as stated in the Privacy Policy.

**Plaintiff Anthony Bell**

107.   Mr. Bell is a pastor at World Harvest Faith Center in Carson, California, and is a resident of Lakewood, California.

108.   Mr. Bell has been a user of Facebook for approximately six years.

109.   Mr. Bell read articles about the YDL Breach in or around March 2018. He was concerned that his data had been compromised due to suspicious activity he noticed on his Facebook page around the time of the 2016 election.

110.   Specifically, although Mr. Bell did not intend to vote for Donald Trump during the 2016 election, his Facebook feed was flooded with suggested posts promoting the Trump Campaign and the Tea Party.  This was surprising to Mr. Bell

COAST LAW GROUP LLP

FIRST AMENDED CLASS ACTION COMPLAINT

since he has been extremely vocal about his values, which were in stark contrast to those espoused by the Trump Campaign and the Tea Party.  Mr. Bell believed he may have been targeted for these political ads because he had advertised his church on Facebook.  After the election, these types of posts started to subside.

111.   On or about April 12, 2018, when Mr. Bell accessed his Facebook account, he saw a page with the heading: "**Protecting Your Information**."  The page contained the following text:

> We understand the importance of keeping your data safe.
>
> We have banned the app "This Is Your Digital Life," which one of your friends used Facebook to log into.  We did this because the app may have misused some of your Facebook information by sharing it with a company called Cambridge Analytica.  In most cases, the information was limited to public profile, Page likes, birthday, and current city.
>
> You can learn more about what happened and how you can remove apps and websites anytime if you no longer want them to have access to your Facebook information.
>
> There is more work to do, but we are committed to confronting abuse and put ting you in control of your privacy.

112.   Mr. Bell took a screenshot of the above-referenced page.

113.   Mr. Bell followed a link at the end of the above-referenced page labeled, "Get More Information."  That link redirected him to a second page with the following text:

> **How can I tell if my info was shared with Cambridge Analytica?**
>
> Recently, we shared information about the potential misuse of your Facebook data by apps and websites.  We also shared plans for how we're taking action to prevent this from happening in the future.

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

Check below to see if your information may have been shared with Cambridge Analytica by the app "This Is Your Digital Life."

Was My Information Shared?

Based on our investigation, you don't appear to have logged into "This Is Your Digital Life" with Facebook before we removed it from our platform in 2015.

However, a friend of yours did log in.

As a result, the following information was likely shared with "This Is Your Digital Life":

- Your public profile, Page likes, birthday and current city

A small number of people who logged into "This Is Your Digital Life" also shared their own News Feed, timeline, posts and messages which may have included posts and messages from you. They may have also shared your hometown.

114.   Mr. Bell also took a screenshot of the above-referenced page.

115.   After the two above-referenced pages appeared on his Facebook page, Mr. Bell attempted to access them again, but he was unable to do so.  Thus, he is only able to reference the content through the screenshots he happened to take.

116.   When Mr. Bell reviewed the above-referenced statements, he was upset, fearful, and felt violated.

117.   Shortly after receiving the above-referenced notifications, Mr. Bell purchased a copy of his credit report to attempt to determine if anyone had misused his personal information.

///

///

FIRST AMENDED CLASS ACTION COMPLAINT

**Plaintiff Juliana Watson**

118.    Ms. Watson is a young professional working in advertising and a resident of Culver City, California.

119.    Ms. Watson has maintained a Facebook account since approximately 2009.  She currently has over 1,300 Facebook friends.

120.    On or about April 12, 2018, Ms. Watson logged into her Facebook account and saw a notification pop up briefly at the top of the screen.  She recalled only that the notification was vague.  While she attempted to read and interpret it, the notification disappeared when she inadvertently clicked on another part of the screen.

121.    Ms. Watson has subsequently been unable to locate the notification again from anywhere within her Facebook account.

122.    Ms. Watson then ran a Google search to attempt to learn what may have been posted on her Facebook page.  She came across an article discussing how to tell if your Facebook data was used by Cambridge Analytica.  She followed a link within the article, which appeared to redirect her to her own Facebook account.  She saw a message stating that her data was used.

123.    Ms. Watson was shocked to receive the above-referenced notification.  She knew she had not taken the YDL personality test.  According to the notification, one of her Facebook friends had agreed to release her own information.   The notification did not identify which of Ms. Watson's Facebook friend(s) had released her information.

124.    Ms. Watson was particularly disturbed by the notification that her private Facebook Messenger messages with this friend/these friends may also have been disclosed.  She has private messages going back nearly a decade and has no idea what communications she may have had with her over 1,300 friends over that time period.

///

///

///

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

**Plaintiff Ann Kowaleski**

125. Ms. Kowaleski is in the health care services industry and a resident of Los Angeles, California.

126. Ms. Kowaleski has maintained a Facebook account since approximately 2008. She currently has over 700 Facebook friends.

127. After Ms. Kowaleski read some news articles about the YDL Breach in or around March 2018, she saw a pop-up on her Facebook page. The pop-up required a response to the question, "Do you believe Facebook cares about its users?" The provided responses were a range from "strongly agree" to "strongly disagree." Ms. Kowaleski selected "disagree" as she believed Facebook was at best careless in its protections of data privacy.

128. Ms. Kowaleski has not received any communications from Facebook regarding whether her data has been compromised.

129. At all relevant times hereto, Facebook collected and stored User Information from the Plaintiffs, including their biographical information, educational background, work history, birthday, hometown, family and relationship status, interests, religious and political views, history of websites visited, timeline posts, "likes," current location, online status, and activity in other applications including those controlled and maintained by Facebook.

130. The Plaintiffs have been regular Facebook users at all relevant times. To their knowledge, the Named Plaintiffs never consented to allowing GSR, SCL, or Cambridge access to their User Information.

131. Plaintiffs believe they are among the more than 87 million Americans whose private User Information was misappropriated and compromised by the defendant Co-Conspirators.

132. As a direct result of the YDL Breach, the Plaintiffs have incurred damages including time, expense, and fear and anxiety in securing their personal information and protecting their identities by, for example, instituting security freezes

COAST LAW GROUP LLP

and purchasing identity theft protection because they no longer have control over their User Information. The Plaintiffs have further suffered a loss of the value in their User Information by virtue of the dissemination of the same to Facebook and the Co-Conspirators. Moreover, now that the Plaintiffs' User Information is in the hands of the Co-Conspirators, they face a real and imminent threat of ongoing identity theft and other issues associated with the disclosure of their private information including further dilution in the value of their User Information. They will incur ongoing credit monitoring expenses for the indefinite future.

## CLASS ACTION ALLEGATIONS

133.    Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

134.    The proposed nationwide class is defined as follows:

**All persons in the United States whose personal information was obtained from Facebook, directly or indirectly, by a Co-Conspirator Defendant or other entity, without or in excess of authorization.**

135.    The proposed California class is defined as follows:

**All persons in the State of California whose personal information was obtained from Facebook, directly or indirectly, by a Co-Conspirator Defendant or other entity, without or in excess of authorization.**

136.    Excluded from the Class are Defendants and any entities in which any Defendant or their subsidiaries or affiliates have a controlling interest, and Defendants' officers, agents, and employees. Also excluded from the Class are the judge assigned to this action and any member of the judge's immediate family.

137.    This action is properly brought as a class action for the following reasons:

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

(a)     the proposed Class is so numerous and geographically dispersed throughout the United States that the joinder of all Class members is impracticable. While Plaintiffs do not know the exact number and identity of all Class members, Plaintiffs are informed and believes that there are over fifty million Class members. The precise number of Class members can be ascertained through discovery, which will include Facebook's business records;

(b)     the disposition of Plaintiffs' and proposed Class members' claims in a class action will provide substantial benefits to both the parties and the Court;

(c)     the proposed Class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class member were infringed or violated in the same fashion;

(d)     there are questions of law and fact common to the proposed Class which predominate over any questions that may affect particular Class members. Such common questions of law and fact include, but are not limited to:

i.     Whether Facebook represented that it would safeguard Plaintiffs' and Class members' User Information and not disclose it without consent;

ii.     Whether Defendants improperly obtained Plaintiffs' and Class members' User Information without authorization or in excess of any authorization;

iii.     Whether Facebook was aware of Cambridge's improper collection of Plaintiffs' and Class members' User Information;

iv.     Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their User Information;

v.     Whether Defendants breached a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their User Information;

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

vi.     Whether Class members' User Information was obtained by Cambridge;

vii.     Whether Defendants' conduct violated Cal. Civ. Code § 1750, *et seq.*;

viii.     Whether Defendants' conduct was an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200, *et seq.*;

ix.     Whether Plaintiffs and the Class are entitled to equitable relief, including, but not limited to, injunctive relief and restitution;

x.     Whether Plaintiffs and the other Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief;

xi.     Whether Plaintiffs and Class members have been harmed and the proper measure of relief; and

xii.     Whether Plaintiffs and proposed Class members are entitled to an award of attorneys' fees and expenses against Defendants.

(e)     Plaintiffs' claims are typical of the claims of the members of the proposed class. Plaintiffs and all class members have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all class members and are based on the same legal theories;

(f)     Plaintiffs will fairly and adequately protect the interests of the proposed class in that he has no interests antagonistic to those of the other proposed class members, and Plaintiffs have retained attorneys experienced in consumer class actions and complex litigation as counsel;

(g)     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

i.     Given the size of individual proposed Class members' claims and the expense of litigating those claims, few, if any, proposed Class members could afford to or would seek legal redress individually for the wrongs Defendants

34

committed against them and absent proposed Class members have no substantial interest in individually controlling the prosecution of individual actions;

ii.   This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered, and uniformity of decisions will be insured;

iii.   Without a class action, proposed Class members will continue to suffer damages, and Defendants' violations of law will proceed without remedy while Defendants continues to reap and retain the substantial proceeds of their wrongful conduct; and

iv.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

138.   Defendants have, or have access to, address information for the Class members, which may be used for the purpose of providing notice of the pendency of this class action.

139.   Plaintiffs seek relief on behalf of the proposed Class on grounds generally applicable to the entire proposed Class.

## **FIRST CAUSE OF ACTION**

**Violation of Stored Communications Act, 18 U.S.C. §§ 2701, *et seq*.
(Against Co-Conspirator Defendants Cambridge, Kogan, Bannon, and Emerdata on behalf of the Nationwide Class)**

140.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

141.   The Stored Communications Act ("SCA") provides a private right of action against anyone who "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents

FIRST AMENDED CLASS ACTION COMPLAINT

authorized access to a wire or electronic communication while it is in electronic storage in such system . . . ".  *See* 18 U.S.C. §§ 2701(a) and 2707(a).

142.   The Co-Conspirator Defendants are "persons" within the meaning of the SCA.[61]

143.   The User Information stored by Facebook and compromised by the YDL Breach is encompassed within the definition of "electronic storage" under the SCA.[62]

144.   Cambridge, which was hired by the other Co-Conspirator Defendants, has admitted exceeding its authorization by accessing the User Information for the first time in 2015.[63] Facebook executives have since made statements indicating it learned that Cambridge did *not* delete all illicitly obtained User Information in 2015 despite its "certification" that it had done so.[64] Certain "whistleblowers," including former Cambridge employee Christopher Wylie, have since given interviews detailing how the User Information of over 87 million Facebook users was accessed without authorization.

145.   The court may award damages under the SCA including "actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000." 18 U.S.C. § 2707(c).

146.   Defendant Cambridge exceeded its authorization to access Facebook's servers, and thereby obtained users' electronic communications while they were stored electronically on Facebook's system, network, and/or servers.

147.   Defendants Kogan and Bannon funded, oversaw, ratified, and facilitated Cambridge's unauthorized access and collection of User Information.

---

[61] "[P]erson" means any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation. (18 U.S.C.A. § 2510(6)).

[62] 18 U.S.C. § 2510(17).

[63] https://ca-commercial.com/news/message-acting-ceo-dr-alexander-tayler

[64] https://www.facebook.com/zuck/posts/10104712037900071

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

148.   As a result of Defendants' actions, Plaintiffs and the Class are entitled to statutory damages of $1,000 per violation and injunctive relief from Defendants GSR and Cambridge for violating Plaintiffs' and Class members' privacy rights under the SCA, as well as costs and attorneys' fees pursuant to 18 U.S.C § 2707.

## SECOND CAUSE OF ACTION

### Violation of Stored Communications Act, 18 U.S.C. §§ 2702, *et seq*.
### (Against Defendant Facebook on behalf of the Nationwide Class)

149.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

150.   Defendant Facebook is liable under the SCA (18 U.S.C. § 2702(a)) for unlawfully divulging the contents of Plaintiffs' and Class members' communications to third parties, including but not limited to the Co-Conspirator Defendants.

151.   The SCA prohibits a "person or entity providing an electronic communication service to the public" from "knowingly divulg[ing] to any person or entity the contents of a communication while in electronic storage by that service." (18 U.S.C. § 2702(a)).

152.   Facebook is a "person" within the meaning of the SCA.[65] It provides an "electronic communication service" as that term is defined in the code.[66] The User Information stored by Facebook and compromised by the YDL Breach is encompassed within the definition of "electronic storage" under the SCA.[67]

153.   Facebook's provision of the User Information to the Co-Conspirator Defendants exceeded any authorization by any of the Plaintiffs or Class members. Moreover, Facebook was aware of its divulging of these communications as evidenced

_____

[65] "[P]erson" means any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation. (18 U.S.C.A. § 2510(6)).

[66] "electronic communication service" means any service which provides to users thereof the ability to send or receive wire or electronic communications.

[67] 18 U.S.C. § 2510(17).

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

by, first, its acknowledgment of the 2015 unauthorized harvesting of tens of millions of Facebook users' information by Cambridge and Kogan on behalf of Senator Ted Cruz's presidential campaign.[68] After Facebook had knowledge of the 2015 breach by Cambridge, it failed to ban Defendant Cambridge from Facebook, as its own policy required.[69] In fact, Facebook did not ban Cambridge until after a whistleblower leaked the story of the YDL Breach in the press on or about March 16, 2018.[70]

154.   As a result of Defendant Facebook's actions, Plaintiffs and the Class are entitled to statutory damages of $1,000 per violation and preliminary and equitable relief from Defendant Facebook for violating Plaintiffs' and Class members' privacy rights under the SCA, as well as costs and attorneys' fees pursuant to 18 U.S.C § 2707.

## **THIRD CAUSE OF ACTION**

**For Violation of the California Customer Records Act,
California Civil Code §§ 1798.80, *et seq*.
(Against Facebook on behalf of the California Class)**

155.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

156.   Plaintiffs bring this cause of action on behalf of the California Class whose personal User Information is maintained by Facebook and which was compromised.

157.   "[T]o ensure that personal information about California residents is protected," the California Legislature enacted Civil Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal

---

[68] https://www.facebook.com/zuck/posts/10104712037900071.
[69] http://billmoyers.com/story/kushner-timeline/.
[70] https://www.cnbc.com/2018/03/16/facebook-bans-cambridge-analytica.html

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 1798.81.5(b).

158.   Facebook is a "business" within the meaning of Civil Code § 1798.80(a).

159.   Plaintiffs and members of the class are "individual[s]" within the meaning of the Civil Code § 1798.80(d). Pursuant to Civil Code § 1798.80(e), the User Information is "personal information," which includes, but is not limited to, an individual's name, physical characteristics or description, address, telephone number, education, employment, employment history, and medical information.

160.   The breach of the personal User Information of tens of millions of Facebook customers constituted a "breach of the security system" of Facebook pursuant to Civil Code § 1798.82(g).

161.   By failing to implement reasonable measures to protect its customers' personal User Information, Facebook violated Civil Code § 1798.81.5.

162.   In addition, by failing to promptly notify all affected California residents that their personal User Information had been acquired (or was reasonably believed to have been acquired) by unauthorized persons in the YDL Breach, including by the Co-Conspirator Defendants, Facebook violated Civil Code § 1798.82. Facebook's failure to timely and adequately notify users of the breach leaves Class members vulnerable to continued misuse of their User Information and prevents Class members from taking adequate steps to protect their identities.

163.   By violating Civil Code §§ 1798.81.5 and 1798.82, Facebook "may be enjoined" pursuant to Civil Code § 1798.84(e).

164.   Accordingly, Plaintiffs request that the Court enter an injunction requiring Facebook to implement and maintain reasonable security procedures to protect customers' User Information in compliance with the California Customer Records Act, including, but not limited to: (1) ordering that Facebook, consistent with industry standard practices, engage third party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks,

COAST LAW GROUP LLP

penetration tests, and audits on Facebook's systems on a periodic basis; (2) ordering that Facebook engage third party security auditors and internal personnel, consistent with industry standard practices, to run automated security monitoring; (3) ordering that Facebook audit, test, and train its security personnel regarding any new or modified procedures; (4) ordering that Facebook, consistent with industry standard practices, conduct regular database scanning and securing checks; (5) ordering that Facebook, consistent with industry standard practices, periodically conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; (6) ordering that Facebook meaningfully educate its former and current users and employees about the threats they face as a result of the loss of their personal User Information to third parties, as well as the steps they must take to protect themselves; and (7) ordering Facebook to encrypt sensitive personal information.

165.   Plaintiffs further request that the Court require Facebook to (1) identify and properly notify all members of the Class who have not yet been informed of the breach; and (2) notify affected former and current users and employees of any future data breaches by email within 24 hours of Facebook's discovery of a breach or possible breach and by mail within 72 hours.

166.   As a result of Facebook's violation of Civil Code §§ 1798.81.5 and 1798.82, Plaintiffs and members of the Class have and will incur economic damages relating to time and money spent remedying the breach, including, but not limited to, monitoring their online presence to ensure that their identity has not been stolen or coopted for an illicit purpose, any unauthorized charges made on financial accounts, lack of access to funds while banks issue new cards, tax fraud, as well as the costs of credit monitoring and purchasing credit reports.

167.   Plaintiffs, for themselves and on behalf of the members of the Class, seek all remedies available under Civil Code § 1798.84, including, but not limited to: (a) damages suffered by members of the Class; and (b) equitable relief.

COAST LAW GROUP LLP

FIRST AMENDED CLASS ACTION COMPLAINT

168.   Plaintiffs, for themselves and on behalf of the members of the Class, also seek reasonable attorneys' fees and costs under applicable law including California Code of Civil Procedure § 1021.5 and Federal Rule of Civil Procedure 23.

## **FOURTH CAUSE OF ACTION**

**For Violations of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (Against Co-Conspirator Defendants on behalf of the Nationwide Class)**

169.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

170.   Upon information and belief, the Co-Conspirator Defendants associated with one another for the purpose of utilizing illicitly obtained User Information for the targeting of digital political propaganda (the "Digital Political Propaganda Enterprise"). The Co-Conspirator Defendants therefore constitute a RICO enterprise pursuant to 18 U.S.C. § 1961(4). In the alternative, these individuals and entities constitute an enterprise because they associated together for the common purpose of utilizing illicitly obtained personally identifiable information for the targeting of digital political propaganda.

171.   The association-in-fact Digital Political Propaganda Enterprise consisted of the following structure: the Co-Conspirator Defendants – Cambridge Analytica, Aleksandr Kogan, Stephen K. Bannon and Emerdata – along with other individuals and entities, including unknown third parties involved in data mining and data analysis, operated an association-in-fact enterprise, which was formed for the purpose of utilizing illicitly obtained User Information for the targeting of digital political propaganda. Each of the Co-Conspirator Defendants was employed by or associated with, and conducted or participated in the affairs of the Digital Political Propaganda Enterprise:

(a)      Cambridge Analytica participated in, operated and/or directed the Digital Political Propaganda Enterprise by, among other things: (i) illicitly gathering

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

1  and otherwise improperly harvesting personally User Information from millions of

2  unsuspecting consumers, for the purposes of targeting those same consumers with

3  digital political propaganda; (ii) providing the necessary funding and personnel

4  necessary to gather the User Information from millions of American consumers;

5      (b)    Aleksandr Kogan participated in, operated and/or directed the

6  Digital Political Propaganda Enterprise by, among other things: (i) creating a U.K.

7  company called Global Science Research, Ltd. ("GSR") which was part of a scheme

8  to dupe users into providing their User Information, which was part of the broader

9  scheme of illegally harvesting of data; (ii) through GSR, creating a Facebook app

10 called "ThisIsYourDigitalLife" ("YDL") which consisted of a personality quiz; (iii)

11 utilizing Amazon Mechanical Turk's ("MTurk") program to recruit participants

12 (known as "Turkers") to complete the personality quiz; and (iv) utilizing the data

13 gathered through the quiz to improperly harvest the data of millions of Facebook

14 subscribers;

15     (c)    Stephen K. Bannon participated in, operated and/or directed the

16 Digital Political Propaganda Enterprise by, among other things: (i) founding

17 Cambridge Analytica; (ii) obtaining funding for the efforts of Cambridge Analytica;

18 (iii) acting as a Vice-President of Cambridge Analytica and (iv) overseeing the efforts

19 of Cambridge Analytica to collect troves of Facebook data;

20     (d)    Emerdata participated in, operated and/or directed the Digital

21 Political Propaganda Enterprise by virtue of its liability as a successor entity of

22 Cambridge.

23     172.  The Co-Conspirator Defendants worked together to accomplish their

24 scheme or common course of conduct. This enterprise has been in operation since at

25 least 2014.

26     173.  The racketeering activity committed by each of the members of the

27 Digital Political Propaganda Enterprise affected interstate commerce.

28

COAST LAW GROUP LLP

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

174.   On information and belief, the Co-Conspirator Defendants agreed to and did conduct and participate, directly and indirectly, in the conduct of the Digital Political Propaganda Enterprise's affairs in a pattern of racketeering activity targeted at intentionally defrauding Facebook users including, without limitation, via nominal payments and numerous intentionally false representations averred herein with the specific intent of inducing Facebook users to unwittingly share other users' private User Information.

175.   Pursuant to and in furtherance of their corrupt scheme, the Co-Conspirator Defendants did in fact induce Facebook users to unwittingly share other Facebook users' User Information via hundreds of thousands of separate electronic monetary transfers.

176.   The Co-Conspirator Defendants willfully and knowingly devised a scheme with artifice to defraud Facebook users and to obtain, sell, and use personal User Information by false pretenses and representations, including, but not limited to, the representation that the data would only be used for academic purposes.

177.   The payments made or directed by the Co-Conspirator Defendants or any other entity to obtain Facebook data compromised in the YDL Breach were in furtherance of the fraudulent scheme. On information and belief, those payments were made by wire transfer or other electronic means through interstate or foreign commerce.

178.   The payments made from any of the Co-Conspirator Defendants or directed by any Co-Conspirator to takers of the YDL quiz were in furtherance of the fraudulent scheme. On information and belief, those payments were made by wire transfer or other electronic means through interstate or foreign commerce.

179.   The acts of wire fraud averred herein constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

180.   The Co-Conspirator Defendants have directly and indirectly participated in the conduct of the Conspiracy's affairs through the pattern of racketeering and

FIRST AMENDED CLASS ACTION COMPLAINT

activity alleged herein, in violation of 18 U.S.C. § 1962(c). Facebook aided and abetted the Co-Conspirator Defendants by misleading its users to believe that their data was safe, while permitting third-party apps like GSR's to access and use the data of non-consenting users without their permission and knowledge, and the other Co-Conspirator Defendants directly participated in the conspiracy by misleading quiz-takers that they were allowing Co-Conspirator Defendants' access to only their personal data for academic purposes, when in fact they were allowing access to their friends' data, and by fraudulently obtaining the data, selling it in interstate and foreign commerce, and using it to influence elections.

181.   Plaintiffs and Class members were harmed by the Co-Conspirator Defendants' conduct because the private information they did not intend to become public or disclose to third parties was acquired by companies who intended to and did use it illicitly for manipulating elections and other as yet unknown purposes. Furthermore, the security breach put Plaintiffs and Class members in imminent and real danger of having their identities stolen by anyone willing to pay these unscrupulous companies for the data. In addition, Plaintiffs and class members spent time and money securing their personal information and protecting their identities, by, for instance, purchasing identity theft protection. The harm and value of the User Information is made plain by the fact that Cambridge paid $7 million to acquire the information.

182.   As a direct and proximate result of the Co-Conspirator Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs and the Class have been injured.

183.   Plaintiffs demand judgment in their favor and against the Co-Conspirator Defendants jointly and severally for compensatory, treble, and punitive damages with interest, the costs of suit and attorneys' fees, and other and further relief as this Court deems just and proper.

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

184.   The actions of the Co-Conspirator Defendants were undertaken with fraud, malice, or oppression, or with a willful and conscious disregard of the rights or safety of Plaintiffs and class members. As such, Plaintiffs and each of the Class members are entitled to an award of exemplary and punitive damages against each of the Co-Conspirator Defendants in an amount according to proof at trial.

## FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion
### (Against All Defendants on behalf of the Nationwide Class)

185.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

186.   Plaintiffs and Class members input their private User Information onto their individual Facebook profiles.

187.   Plaintiffs and Class members were given a false sense of security in their private User Information by believing they had control over their Facebook profile "privacy settings." Those settings prompt users to select who can see their posts, their friend requests, their lists of friends, who can locate their profiles using their designated email address and/or phone number, and whether search engines outside of Facebook are permitted to link to their profiles. The categories of individuals who are purportedly given access to the aforementioned information are Facebook friends, "friends of [Facebook] friends," or the public at large.

188.   By inputting their User Information onto their individual Facebook profiles, Plaintiffs and Class members thus have a reasonable expectation that they can control who may access that information. By extension, they have a reasonable expectation that only the individuals they designate to allow access to this information will in fact have access to it. As Facebook puts it, Plaintiffs and Class members expect to "own all of [their] information." With respect to everyone besides to whom Plaintiffs and Class members give express permission to see particular information, their reasonable expectation is for that information to remain private.

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

189.   By acquiring and using Plaintiffs' and Class members' User Information from their Facebook accounts without their permission as alleged above, Defendants intentionally intruded in Plaintiffs' and Class members' private information.

190.   Defendants' intrusion in and theft of Plaintiffs' and class members' personal User Information from their Facebook accounts would be highly offensive to a reasonable person in that (1) the Co-Conspirator Defendants stole a huge amount of personal and private information about each person in order to effectively manipulate American elections; (2) the Co-Conspirator Defendants were motivated by profit and political ambition and their collective goal was to serve their own purposes of manipulating the American political process and preying on people's fears and subliminal motivations to distort their beliefs and ultimately undermine American democracy; and (3) the intrusion occurred in the setting of Facebook, a social networking platform which lured its users into a false sense of security because of Facebook's own representations and policies which appeared to protect the data its users share with their friends and family (and not with corporations attempting to manipulate political elections through the use of misinformation and targeting of digital political propaganda).

191.   Plaintiffs and Class members were harmed by Defendants' conduct because the User Information they did not intend to become public was acquired by entities and individuals for the illicit purpose of targeting digital political propaganda to manipulate elections. Furthermore, the YDL Breach put Plaintiffs and class members in imminent and real danger of having their identities stolen by anyone willing to pay these unscrupulous companies for the use of the data. The magnitude of harm to and the value of Plaintiffs' and class members' User Information is also demonstrated by the fact that Cambridge paid $7 million to illicitly acquire the User Information. Plaintiffs and members of the class have and will incur economic damages relating to time and money spent remedying the breach, including, but not limited to, monitoring their online presence to ensure that their identity has not been

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

stolen or coopted for an illicit purpose, any unauthorized charges made on financial accounts, lack of access to funds while banks issue new cards, tax fraud, as well as the costs of credit monitoring and purchasing credit reports.

192.   Defendants' conduct was a substantial factor in causing Plaintiffs' and Class members' harm.

193.   Facebook and the Co-Conspirator Defendants aided and abetted Cambridge's intrusion into Plaintiffs and Class members' private affairs because they (1) knew or should have known about this intrusion; (2) gave substantial assistance to the Co-Conspirators by allowing applications like those utilized by Kogan to access user's friends' User Information without their consent and failing to notify their users of the YDL Breach or otherwise attempting to stop the breach or control the User Information leaked as a result thereof for at least two years; (3) Facebook's actions and failure to act was a substantial factor in causing harm to Plaintiffs and Class members because it had the capability of stopping the intrusion at any time, but knowingly failed to do so.

194.   The actions of these Defendants were undertaken with fraud, malice, or oppression, or with a willful and conscious disregard of the rights or safety of Plaintiffs and Class members. As such, Plaintiffs and each of the Class members are entitled to an award of exemplary and punitive damages against each of the Defendants in an amount according to proof at trial.

## SIXTH CAUSE OF ACTION

### Violation of California Constitution Article I, Section I
### (Against All Defendants on behalf of the California Class)

195.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

196.   Plaintiffs and the Class members have reasonable expectations of privacy in their User Information.

47

COAST LAW GROUP LLP

197.   The reasonableness of such expectations of privacy is supported by Facebook's own data privacy policy set forth in its Statement of Rights and Responsibilities. As set forth above, those policies expressly inform users that they own all of their User Information and "can control how it is shared through [their] privacy and application settings." It is further supported by the clandestine and highly technical means utilized by the Defendants to gain access to User Information through the YDL Breach as discussed in detail above.

198.   Defendants intentionally intruded on and into Plaintiffs' and the Class members' solitude, seclusion, or private affairs. Facebook designed the application with corresponding privacy and application settings in such a way to lure its users into a false sense of comfort to expand their network of "friends" and thus increase users.

199.   These intrusions are highly offensive to a reasonable person. This is evidenced by, among other things, the sharp drop in Facebook stock shares following the whistleblowers' revelations of the acts described herein;[71] the calls by lawmakers in the United States and United Kingdom for Facebook CEO Mark Zuckerberg to answer regarding the YDL Breach; and the #deletefacebook movement by many to remove their Facebook accounts due to fear caused by the YDL Breach.

200.   Plaintiffs and the Class members were harmed by the intrusion into their private affairs as further detailed herein.

201.   Defendants' actions as alleged herein were a substantial factor in causing the harm suffered by Plaintiffs and the Class members.

202.   As a result of Defendants' actions, Plaintiffs and the Class members seek injunctive relief, as detailed in the prayer below and as set forth further in Plaintiffs' accompanying Motion for Preliminary Injunction.

COAST LAW GROUP LLP

---

[71] https://www.thesun.co.uk/tech/5853280/facebook-share-price-value-latest-cambridge-analytica-stock-price/.

FIRST AMENDED CLASS ACTION COMPLAINT

1    203.   As a result of Defendants' actions, Plaintiffs and the Class members

2    further seek nominal and punitive damages in amounts to be determined at trial. The

3    actions of these Defendants were undertaken with fraud, malice, or oppression, or with

4    a willful and conscious disregard of the rights or safety of Plaintiffs and class members.

5    As such, Plaintiffs and each of the Class members are entitled to an award of exemplary

6    and punitive damages against each of the Defendants in an amount according to proof

7    at trial.

8    ## SEVENTH CAUSE OF ACTION

9    **Violation of California Invasion of Privacy Act (Cal. Pen. Code § 637.7)**
10    **(Against All Defendants on behalf of the California Class)**

11    204.   Plaintiffs re-allege and incorporate by reference the allegations contained

12    in the paragraphs above as if fully set forth herein.

13    205.   Plaintiffs allege against all Defendants violations of California Penal

14    Code §§ 630, *et seq.*, the California Invasion of Privacy Act ("CIPA"), specifically

15    California Penal Code § 637.7 for the unlawful acquisition of Plaintiffs' and Class

16    members' User Information without their consent.

17    206.   The intent of the CIPA is set forth in California Penal Code § 630: "The

18    Legislature hereby declares that advances in science and technology have led to the

19    development of new devices and techniques for the purpose of eavesdropping upon

20    private communications and that the invasion of privacy resulting from the continual

21    and increasing use of such devices and techniques has created a serious threat to the

22    free exercise of personal liberties and cannot be tolerated in a free and civilized

23    society."

24    207.   California Penal Code § 637.7 specifically prohibits the "electronic

25    tracking device to determine the location or movement of a person." "Electronic

26    tracking device" is defined as "any device attached to a vehicle or other movable thing

27    that reveals its location or movement by the transmission of electronic signals."

28

COAST LAW GROUP LLP

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

208.   Among the myriad of User Information maintained by Facebook and harvested by the Co-Conspirators was the location of Plaintiffs and the Class members while those individuals were running the Facebook application on their smartphone devices.

209.   Plaintiffs and the Class members did not consent to the acquisition of their location or movement information by Facebook or the Co-Conspirator Defendants.

210.   Defendants' violations of CIPA occurred in California as Facebook is a California business entity, and the agreement between Facebook and its users provides for the application of California law.

211.   As a result of the Defendants' violations of California Penal Code § 637.7, Plaintiffs and the Class members are entitled to monetary relief in the amount set forth in California Penal Code § 637.2(a) for each Class member.

212.   Pursuant to California Penal Code § 637.2(b), as a result of Defendants' violations of California Penal Code § 637.7, Plaintiffs and the Class members are further entitled to preliminary and permanent injunctive relief as set forth herein and in the accompanying Motion for Injunctive Relief; declaratory relief; attorney's fees; and costs of litigation.

## **EIGHTH CAUSE OF ACTION**

### **Conversion**
### **(Against All Defendants on behalf of the Nationwide Class)**

213.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

214.   Plaintiff and Class members were the owners and possessors of their User Information. As a result of the Defendants' wrongful conduct, Defendants have interfered with the Plaintiffs' and Class members' right to possess and control such property, to which they had a superior right of possession and control at the time of conversion.

FIRST AMENDED CLASS ACTION COMPLAINT

215.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered injury, damage, loss or harm and therefore seek compensatory damages.

216.   In converting Plaintiffs' User Information, Defendants acted with malice, oppression, and in conscious disregard of the Plaintiffs' and Class members' rights. Plaintiffs, therefore, seek an award of punitive damages on behalf of the Class.

## NINTH CAUSE OF ACTION

### Unfair, Unlawful, and Fraudulent Business Acts and Practices Under California Business & Professions Code §§ 17200, *et seq*.
### (Against All Defendants on behalf of the Nationwide Class)

217.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

218.   Defendants' acts and practices, as alleged in this Complaint, constitute unfair, unlawful, and fraudulent business practices, in violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.

219.   Facebook represented that it would not disclose user's Personal Information without consent and/or notice. Specifically, Facebook represented in the Statement of Rights and Responsibilities to which even account holder is required to assent at the time of registration that: "You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings."

220.   Facebook also required application developers, like Cambridge, to obtain and utilize users' Personal Information in specified, limited ways.

221.   Facebook failed to abide by these representations. Facebook did not prevent improper disclosure of Plaintiffs' and the Class' Personal Information.

222.   Cambridge obtained Plaintiffs' and the Class' Personal Information either wholly without authorization or in excess of any authorization it may have obtained.

51

COAST LAW GROUP LLP

223.   As more fully described above, Defendants' acts of falsely portraying themselves as collecting data for academic purposes constitutes an unfair business act or practice within the meaning of Bus. & Prof. Code §§17200, *et seq*., in that the justification for Defendants' conduct is outweighed by the gravity of the consequences to the general public. There were reasonable available alternatives for Defendants to further their business interests than misleading the public about their true intent. Indeed, the burden and expense of disclosing the actual reason for seeking User Information would be minimal while the negative impact on the Class on the aggregate is significant. Such conduct is also contrary to public policy, immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

224.   Defendants' conduct further constitutes "unfair" business acts and practices because the practices are "likely to cause substantial injury" to Plaintiffs and Class members, which are not "reasonably avoidable" by Plaintiffs and the Class and the injury is "not outweighed" by the practice's benefits to Plaintiffs and the Class. Such conduct is ongoing and continues to this date.

225.   Defendants' acts, omissions, and misrepresentations as alleged herein also constitute a violation of the unlawful prong of the UCL as they failed to comport with a reasonable standard of care and public policy as reflected in statutes such as: Stored Communications Act, 18 U.S.C. §§ 2701; Cal. Pen. Code § 637.7; California Civil Code § 1798.81.5(b); Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a); Violations of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c); California Business & Professions Code § 22576 (as a result of Facebook failing to comply with its own posted policies), and the California Customer Records Act.

226.   Plaintiffs reserve the right to allege other violations of law that constitute unlawful business acts or practices based upon the above-described conduct. Such conduct is ongoing and continues to this date.

FIRST AMENDED CLASS ACTION COMPLAINT

227.   As more fully described above, Defendants' acts and practices with respect to their misrepresentations and omissions in falsely advertising the privacy of the Facebook user information, have a tendency to deceive Plaintiffs and members of the Class, thus constituting a fraudulent business act or practice. Plaintiffs allege on information and belief such conduct is ongoing and continues to this date.

228.   Defendants knew, recklessly disregarded, or should have known that their representations, omissions, and non-disclosures were false, misleading, untrue, deceptive, or likely to deceive or mislead the public.

229.   Plaintiffs and the Class relied upon Defendants' material representations, omissions, and non-disclosures to their detriment in that they would not have downloaded the Facebook application and/or registered for Facebook accounts or would not have continued to use their Facebook accounts had they known that Facebook was disseminating and/or sharing their User Information in a manner inconsistent with the Privacy Policy.

230.   Plaintiffs and the Class members suffered injury in fact and lost money or property as the result of Defendants' unfair, unlawful, and fraudulent business practices. In particular, Plaintiffs and Class members' Personal Information was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the information is of tangible value. Plaintiffs and Class members are therefore entitled to injunctive relief available under Business & Professions Code § 17200, *et seq*.

231.   As a result of Defendants' unlawful business practices, Plaintiffs and the Class are entitled to restitution, disgorgement of wrongfully obtained profits and injunctive relief.

232.   Plaintiffs and the Class also seek recovery of their attorneys' fees pursuant to California Code of Civil Procedure § 1021.5.

COAST LAW GROUP LLP

53

FIRST AMENDED CLASS ACTION COMPLAINT

**TENTH CAUSE OF ACTION**

**Negligence**
**(Against Facebook on behalf of the Nationwide Class)**

233.  Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

234.  Facebook owed Plaintiffs and members of the Class a legal duty to exercise reasonable care in safeguarding and protecting the User Information it collected and maintained of its users. This duty included, among other things, maintaining and testing Facebook's security systems and taking other reasonable security measures to protect and adequately secure the personal data of Plaintiffs and the class from unauthorized access and use. Facebook's security system and procedures for handling the personal User Information were intended to affect Plaintiffs and the Class. Facebook was aware that by taking such sensitive information of users, it had a responsibility to take reasonable security measures to protect the data from being stolen and, in the event of theft, easily accessed.

235.  The duty Facebook owed to Plaintiffs and members of the class to protect their personal User Information is also underscored by the California Customer Records Act.

236.  Additionally, Facebook had a duty to timely disclose to Plaintiffs and members of the Class that their personal User Information had been or was reasonably believed to have been compromised and made accessible to unauthorized third parties, including Cambridge. Timely disclosure is appropriate to enable Plaintiffs and members of the Class to, among other things, monitor their online presence to ensure it has not been coopted for illicit purposes; undertake appropriate measures to avoid unauthorized charges on their debit card or credit card accounts; purchase credit monitoring services; change or cancel their debit or credit card PINs (personal identification numbers) to prevent or mitigate the risk of fraudulent cash withdrawals or unauthorized transactions; and opt to delete their accounts entirely to insulate

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

themselves or their minor children from being targeted by misleading, manipulative, or otherwise unwanted misinformation or political propaganda.

237.   There is a very close connection between Facebook's failure to take reasonable security standards to protect its users' data and the injury to Plaintiffs and the Class. If not for Facebook's negligence, the Co-Conspirator Defendants would not have been able to steal Plaintiffs' and the Class's information and use it for their own political purposes.

238.   Facebook is to blame for not protecting the User Information, misrepresenting to its users how secure their User Information was, and by failing to take reasonable security measures. If Facebook had taken reasonable security measures, data thieves, like Cambridge, would not have been able to take the personal User Information of over 87 million Americans and, in concert with the Co-Conspirator Defendants, use it to manipulate the American people and undermine American democracy.

239.   The policy of preventing future harm weighs in favor of finding a special relationship between Facebook and the class. Facebook's users count on Facebook to take reasonable efforts to secure their sensitive User Information and in fact are encouraged to share such sensitive personal data with Facebook. If companies are not held accountable for failing to take reasonable security measures to protect their customers' personal information, they will not take the necessary steps to protect against future breaches.

240.   It was foreseeable that Facebook's failure to take reasonable security measures would lead to the misappropriation of Plaintiffs' and class members' User Information. In fact, on information and belief, Facebook had actual knowledge that third-party applications including the YDL survey could and did steal the User Information of users without those users' knowledge or consent. Large companies, particularly social networking sites with millions of users such as Facebook, face a significant threat of security breaches due in part to the large volume and type of data

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

they possess. Facebook should have known to take precautions to secure its users' User Information, especially in light of the massive volume of data accumulated by Facebook from its users.

241.   Facebook breached its duty to exercise reasonable care in protecting the User Information of Plaintiffs and the Class by failing to implement and maintain adequate security measures to safeguard its users' User Information, failing to monitor its systems to identify suspicious activity or act on identified suspicious activity, allowing unauthorized access to the personal information of Plaintiffs and the Class, and failing to encrypt or otherwise prevent unauthorized reading of such User Information.

242.   Facebook further breached its duty to timely notify Plaintiffs and the Class about the data breach. Additionally, Facebook was, or should have been, aware of unauthorized access to its users' User Information as early as 2014.

243.   But for Facebook's failure to implement and maintain adequate security measures to protect its users' personal User Information and failure to monitor its systems to identify suspicious activity or act on identified suspicious activity, the User Information of Plaintiffs and members of the Class would not have been stolen, and they would not be at a heightened risk of identity theft in the future.

244.   Facebook's negligence was a substantial factor in causing harm to Plaintiffs and members of the Class.

245.   As a direct and proximate result of Facebook's failure to exercise reasonable care and use commercially reasonable security measures, the User Information of current and former Facebook users was accessed by unauthorized individuals who could use the information to commit identity fraud, medical fraud, or debit and credit card fraud. Plaintiffs and the Class face a heightened risk of identity theft in the future.

246.   As a further direct and proximate result of Facebook's failure to exercise reasonable care and use commercially reasonable security measures, User Information

COAST LAW GROUP LLP

FIRST AMENDED CLASS ACTION COMPLAINT

of millions of current and former Facebook users such as Plaintiffs' was disclosed without their authorization. This illicit disclosure of Plaintiffs' and the Class members' User Information constituted an injury as said personal information has an actual and ascertainable value. The inherent value of the User Information is substantiated by the $7 million Cambridge and SCL Group paid to acquire the data, in addition to $1 million paid to GSR.

247.   Plaintiffs and members of the Class have also suffered economic damages, including the purchase of credit monitoring services they would not have otherwise purchased.

248.   Neither Plaintiffs nor other members of the Class contributed to Facebook's breach(es), nor did they contribute to Facebook's employment of insufficient security measures to safeguard their User Information.

## ELEVENTH CAUSE OF ACTION

### Negligence Per Se
### (Against Facebook on behalf of the Nationwide Class)

249.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

250.   Plaintiffs allege Facebook owed Plaintiffs and the members of the class the duties of care as set forth in the preceding cause of action.

251.   Plaintiffs allege Facebook was and is subject to various California and federal laws pertaining to safeguarding personal data including User Information to the California Consumer Records Act (Cal. Civ. Code §§ 1798.80, *et seq.*); the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); the Stored Communications Act (18 U.S.C. §§ 2701, *et seq.*); Section 5(a) of the Federal Trade Commission Act (15 U.S.C. § 45(a)); and California Business & Professions Code § 22576 (as a result of Facebook failing to comply with its own posted policies) and that such laws were intended to prevent the type of harm suffered by the Plaintiffs and Class members as alleged herein.

57

252.   Plaintiffs and Class members allege that they are members of a class composed of Facebook users for whose benefit those laws were passed.

253.   As further alleged herein, Plaintiffs allege that Facebook did in fact violate one or more of the aforementioned laws and as such breached its duty of care owed to the Plaintiffs and Class members as set forth above.

254.   Plaintiffs and the class members suffered the same type of harm that the laws were intended to prevent resulting in harm, including the illicit misappropriation of Plaintiffs' and the Class members' User Information in order to target them with misleading, manipulative, or otherwise unwanted misinformation and political propaganda designed to improperly influence the outcome of elections in America.

255.   As a further direct and proximate result of Facebook's failure to exercise reasonable care and use commercially reasonable security measures, the User Information of current and former Facebook users was accessed by unauthorized individuals who could use the information to commit identity fraud, medical fraud, or debit and credit card fraud. Plaintiffs and the class face a heightened risk of identity theft in the future.

256.   Facebook's violations of one or more of the aforementioned laws were a substantial factor in bringing about the harms suffered by the Plaintiffs and Class members.

## TWELFTH CAUSE OF ACTION

### Breach of Written Contract
### (Against Defendant Facebook on behalf of the Nationwide Class)

257.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

258.   In order to register as users of Facebook, Plaintiffs and the Class were required to, and did, affirmatively assent to its Terms and Conditions and Privacy Policy (the "Agreement").

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

259.   The Agreement's provisions constitute a valid and enforceable contract between Plaintiffs and the Class on the one hand, and Facebook on the other.

260.   Under the Agreement, Plaintiffs and the Class transmitted sensitive personal information, including personally identifiable information, to Facebook in exchange for use of Facebook and Facebook's promise that it would not share that personal information with third parties, including but not limited to advertisers, without their authorization.

261.   Specifically, the Agreement provides that "You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings." Facebook breached this provision as alleged herein.

262.   Facebook users effectively pay for Facebook's services through their provision of their sensitive personal information into Facebook's safekeeping.

263.   Facebook's users exchange something valuable, providing Facebook with access to their sensitive and unique personal information, and in return, Facebook's users obtain access to Facebook's services.

264.   A material consideration for Plaintiffs' transmission of their sensitive personal information to Facebook is Facebook's promise to safeguard their sensitive personal information.

265.   In particular, Facebook promised that any personal information submitted by its users would only be disclosed to other users and third parties in the specific ways and circumstances set forth in Facebook's privacy policy and with user consent.

266.   Facebook materially breached the terms of the Agreement through its unlawful conduct alleged herein, including its disclosure of Plaintiffs' and the Class's sensitive personal information to Cambridge.

267.   As a result of Facebook's misconduct and breach of the Agreement described herein, Plaintiffs and the Class suffered damages.

FIRST AMENDED CLASS ACTION COMPLAINT

268.   Plaintiffs and the Class members did not receive the benefit of the bargain for which they contracted and for the transmission of their sensitive and unique personal information, which, as alleged above, has ascertainable value to be proven at trial.

269.   Plaintiffs and each Class member gave up something of value, their sensitive User Information, in exchange for access to Facebook and Facebook's privacy promises.

270.   Facebook materially breached the Agreement by violating its privacy terms, thus depriving Plaintiffs and Class members the benefit of the bargain.

271.   Thus, Plaintiffs' and the Class members' actual and appreciable damages consist of the value of their sensitive User Information that Facebook wrongfully shared with Cambridge through Facebook's unauthorized consent, neglect or recklessness.

272.   The sensitive personal information captured by Facebook and disclosed to Cambridge was an exceptionally egregious breach of trust between Facebook, Plaintiffs and the Class members because their sensitive User Information included such valuable and personal data as voting preferences, political opinions, psychological profiles and vulnerabilities, preferred news sources related to political candidates as well as economic, religious and doctrinal issues that all related to the 2016 election cycle.

273.   Facebook's breach was exacerbated by Cambridge's efforts to illegally, deceptively, and improperly influence the 2016 Presidential election.

274.   Plaintiffs seek damages based on Facebook's breach of the Agreement and disgorgement from Facebook of the proceeds that Facebook wrongfully obtained by breaching the Agreement.

275.   Plaintiffs also seek damages which flow directly from Facebook allowing Cambridge to improperly influence the 2016 Presidential election.

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

COAST LAW GROUP LLP

276.    WHEREFORE, Plaintiffs and a nationwide class of Facebook users are entitled to damages, injunctive relief and equitable relief to remedy the above-described misconduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray this Court for the following relief:

A.    That this action be certified and maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certify the proposed class as defined, appointing Plaintiffs as representatives of the Class, and appointing the attorneys and law firms representing Plaintiffs as counsel for the Class;

B.    For an Order declaring Defendants' conduct as detailed above is violative of the law and enjoining Defendants from continuing these acts;

C.    For injunctive relief against Facebook pursuant to California Civil Code § 1798.84(e);

D.    For compensatory and punitive damages in favor of Plaintiffs and proposed Class members;

E.    For statutory damages in the amount of $1,000 for each Plaintiff and proposed Class members pursuant to 18 U.S.C. § 2707(c);

F.    For costs of this action, including reasonable attorneys' fees and expenses;

G.    For pre-judgment and post-judgment interest at the legal rate; and

H.    For such other and further legal and equitable relief as this Court may deem just and proper.

///
///
///
///

61

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 15, 2018                    Respectfully submitted,

**COAST LAW GROUP LLP**
HELEN I. ZELDES (220051)
AMY C. JOHNSGARD (279795)
ANDREW J. KUBIK (246902)
BEN TRAVIS (305641)

    */s/ Helen I. Zeldes*
HELEN I. ZELDES

1140 S. Coast Highway 101
Encinitas, California 92024
Telephone: (760) 942-8505
Facsimile: (760) 942-8515

**CUNEO GILBERT & LaDUCA LLP**
CHARLES J. LADUCA
4725 Wisconsin Ave., NW
Suite 200
Washington, D.C. 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813

**CUNEO GILBERT & LaDUCA LLP**
MICHAEL J. FLANNERY (196266)
7733 Forsyth Boulevard,
Suite 1675
St. Louis, MO 63105
Telephone: 314-226-1015
Facsimile: 202-789-1813

FIRST AMENDED CLASS ACTION COMPLAINT

COAST LAW GROUP LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP**
PAUL L. HOFFMAN (71244)
AIDAN C. McGLAZE (277270)
11543 W. Olympic Blvd
Los Angeles, CA 90064
Telephone: (310) 396-0731
Facsimile: (310)399-7040

**BLOOD HURST & O'REARDON, LLP**
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
501 W. Broadway, Suite 1490
San Diego, CA 92101
Telephone: 619-339-1100
Facsimile: 619-338-1101

*Attorneys for Plaintiffs and the Proposed Class*

FIRST AMENDED CLASS ACTION COMPLAINT